UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HO-CHUAN CHEN and HOSSEIN
BARAHIMI,

          Plaintiffs,

  v.

LINDA DOUGHERTY, et al.,

          Defendants.

No. C04-987 MJP

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on the parties' cross-motions for summary judgment. (Dkt. Nos. 193 & 196.) After reviewing the motions, responses (Dkt. Nos. 225 & 226), and all papers submitted in support thereof, and the balance of the record, the Court GRANTS Plaintiffs' motion and DENIES Defendants' motion for the reasons stated below.

**Background**

Plaintiffs Ho-Chuan Chen and Hossein Barahimi are King County employees who were employed in a division in the King County Department of Transportation known as the Travel Forecasting and Data Management Group ("TFDM"). Plaintiffs filed a lawsuit in April 2004 alleging that they suffered retaliation and discrimination after raising concerns about the use of flawed methodologies and practices regarding traffic decisions in the Department. Plaintiffs sued

ORDER - 1

King County and several supervisors in the Department of Transportation alleging violations of the Washington Law Against Discrimination ("WLAD"), first amendment retaliation, and adverse employment action in violation of public policy.[1] In an order issued on June 28, 2005, the Court dismissed Plaintiffs' WLAD claims, but denied Defendants' summary judgment motion on the Section 1983 claims. (Dkt. No. 86.) Among other things, the Court rejected the individual Defendants' argument that they were entitled to qualified immunity. (Id. at 9.) Defendants submitted an interlocutory appeal on the qualified immunity ruling and the Ninth Circuit issued a decision on March 21, 2007. (See Dkt. Nos. 111 & 127.)

The Ninth Circuit dismissed some issues that were not properly raised, affirmed in part, and remanded the case. Ho-Chuan Chen v. Dougherty, No. 05-35667, 225 Fed. Appx. 665 (9th Cir. 2007). The Ninth Circuit based its remand on an intervening Supreme Court decision, noting:

> After the district court denied summary judgment, the Supreme Court decided Garcetti v. Ceballos, 126 S. Ct. 1951 (2006). Appellants argue that [Garcetti] mandates summary judgment against all of appellees' First Amendment claims because all of the speech that appellees claim was the target of retaliation was made "pursuant to their official duties." See [Garcetti], 126 S. Ct. at 1960. Speech made by a public employee pursuant to his or her official duties is not protected speech and cannot form the basis of a cognizable First Amendment retaliation claim. Id. at 1959. However, because the parties did not develop a factual record regarding this issue below, and because the district court has not ruled on it, we do not reach the issue on appeal. On remand the district court shall determine whether the speech allegedly targeted for retaliation constitutes protected speech in light of [Garcetti]. See Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006). We thus do not preclude appellants from making a renewed motion for summary judgment on this basis on remand.

Id. at 666-67. The Ninth Circuit's mandate issued on April 12, 2008. (Dkt. No. 127.) On September 12, 2008, the parties filed the current cross-motions for summary judgment. (Dkt. Nos. 193 & 196.) These motions address a single issue – whether the speech claimed to be the target of retaliation was made pursuant to Plaintiffs' official duties.

---

[1] Plaintiffs also brought a claim for breach of the collective bargaining agreement but stipulated to its dismissal. (See Dkt. No. 65 at 1.)

ORDER - 2

1         The parties' briefing on these cross-motions was completed on October 10, 2008. Five days later, the Ninth Circuit issued its decision in Posey v. Lake Pend Oreille School Dist. No. 84, 546 F.3d 1121, No. 07-35188, 2008 U.S. App. LEXIS 21565, (9th Cir. Oct. 15, 2008). In Posey the Ninth Circuit sets forth a three-step formula for the inquiry into the protected status of speech. First, the district court must determine "whether the expressions in question were made by the speaker upon matters of public concern[.]" 546 F.3d at 1130 (internal quotation marks and citation omitted). Second, the Court must apply the Pickering balancing test and consider "whether the state lacked adequate justification for treating the employee differently from any other member of the general public[.]" Id. (internal quotation marks omitted) (citing Pickering v. Board of Education, 391 U.S. 563, 568 (1968)). Only after answering each of these questions affirmatively should the court turn to the third consideration, "whether the plaintiff spoke as a private citizen or a public employee." Id.

        This Court addressed steps one and two of the protected speech inquiry in its June 28, 2005 order. The Court found that the speech at issue regarded matters of public concern. (Dkt. No. 86 at 5.) The Court then applied the Pickering balancing test and concluded that it was "not prepared to say as a matter of law that the laundry list of considerations proffered by Defendants ... actually outweighs Plaintiffs' right to be protected against retaliation for speaking out against possible governmental abuses." (Id. at 6.) It is now appropriate to turn to step three of the protected speech analysis – whether Plaintiffs engaged in their speech as public employees or as private citizens.

**Analysis**

        Speech made pursuant to a public employee's official duties is not protected speech and cannot support a claim for first amendment retaliation. Garcetti, 126 S. Ct. at 1959-60. Such speech is not protected "because any restriction on that speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" Posey, 546 F.3d at 1130 (citing Garcetti, 126 S. Ct. at 1951).

ORDER - 3

In Posey, the Ninth Circuit held that whether a plaintiff's speech was made in the course of her official employment responsibilities presents a "mixed question of fact and law." Id. at 1123. "[W]hen there are genuine and material disputes as to the scope and content of the employee's job responsibilities, the court must reserve judgment on this third prong of the protected status inquiry until after the fact-finding process." Id. at 1131.

I. Plaintiffs' Speech

Plaintiffs were employees of a division in the King County Department of Transportation known as the Travel Forecasting and Data Management Group ("TFDM"). TFDM "develops the long range travel forecast models and travel forecasts for comprehensive plan and road projects." (Dkt. No. 195-2 at 82, County App. Brief.) A second group in the department, the Transportation Concurrency Management Group ("TCM"), is responsible for making concurrency decisions. "Concurrency is the process of determining whether the King County road system can accommodate future development in accordance with standards set by the King County Council." (Id.)

Plaintiffs base their retaliation claim on: (1) complaints made to the County Ombudsmen, the County Executive, the County Prosecutor, and the County Council; and (2) a union grievance. The complaints made to County officials contain criticism of TCM's concurrency decisions and allege that certain Department of Transportation supervisors and employees engaged in willful misconduct. The union grievance addressed Plaintiffs' belief that their employer was violating the Union Contract by contracting out TFDM's work. (Dkt. No. 195-2 at 78-80.)

II. TFDM's Criticism of TCM's Application and Concurrency Decision

The parties spend significant time arguing over whether Plaintiffs' employment duties included peer review of TCM's concurrency decisions. Plaintiffs now assert that their job was limited to creating the base computer model for analyzing traffic flow impacts, and they were not responsible for applying that model to specific projects in the course of concurrency determinations or for reviewing concurrency decisions. (Dkt. No. 193 at 2-3.) According to Plaintiffs, "TFDM was

ORDER - 4

simply not responsible for concurrency decisions, nor for how the base model they developed was applied by TCM." (Id. at 3.) Defendants respond by arguing that Plaintiffs' "official duties included reporting concerns about TCM's use of the traffic model," the kind of concerns that were communicated in Plaintiffs' complaints. (Dkt. No. 196 at 10.)

Much evidence has accrued in this action, creating a voluminous and contradictory record. The Court looks first to statements by Jennifer Lindwall, Plaintiffs' direct supervisor, which appear to support a finding that Plaintiffs' employment role was limited to <u>creating</u> the traffic model, not applying it for concurrency determinations, as "Plaintiffs are not concurrency experts." (Dkt. No. 153-3 at 5.) Ms. Lindwall describes the respective roles of TFDM and groups like TCM as follows:

> Other government groups and agencies [such as TCM] take TFDM's long range traffic model and modify, adjust, and recalibrate it for particular governmental applications, such as ... determining Concurrency.

(Dkt. No. 153-3 at 2.) Ms. Lindwall has also stated that it was <u>not</u> part of TFDM's job to insure consistency among all applications of the traffic model, thereby implying that Plaintiffs were not involved in the applications of their model, which would include TCM's application and concurrency determinations. (Dkt. No. 195-2 at 33.) Yet, Plaintiffs' own Whistleblower Retaliation Complaint, filed with the King County Ombudsman on May 5, 2003, contradicts this conclusion, stating that "TFDM was asked to review and assist in the development of the TCM application," and TFDM was "specifically directed to help ensure consistency between the TCM application and TFDM methodologies." (Dkt. No. 153-6 at 49.) In the same document, Plaintiffs allege that TFDM was "the only source of technical oversight to the TCM program." (Dkt. No. 153-6 at 47.)

Although Mr. Chen has declared that TFDM was not responsible for applying the trafflic model for concurrency purposes (Dkt. No. 195-2 at 29-30), he has consistently suggested that TFDM engaged in "peer review" of TCM decisions (Dkt. No. 153-5 at 10). During deposition, Mr. Chen responded to questions from Defendants' attorney Michael Reilly as follows:

ORDER - 5

```
1       Q: You're saying TFDM is excluded from the Concurrency process in determining
            residential concurrency; is that correct?
2       A: We are excluded getting [sic] any information about the Concurrency.
        Q: Well, that's not your job, though, right?
3       A: No, it's our job.
        Q: It is your job?
4       A: Yes.
        Q: Concurrency is your job?
5       A: We do need to know what exactly application [sic] uses the model.  That's our
            job.
```

(Dkt. No. 153-5 at 17.)  Though far from conclusive, this testimony suggests that Mr. Chen believed his official duties required that he have some involvement in the applications of the base traffic model.  In contrast, Mr. Barahimi has declared, "[i]t was not TFDM's job or mine or Mr. Chen's job to make concurrency decisions, to direct TCM how to make concurrency decisions, or <u>to review TCM's concurrency decisions</u>."  (Dkt. No. 194 at 2 (emphasis added).)

These evidentiary contradictions prevent the Court from determining whether Plaintiffs' official job duties included review of TCM's applications of the traffic model and concurrency decisions.  The complexity and contradictions in this record are partly exacerbated by Defendants' shifting goals.  Prior to this motion, Defendants took the position that Plaintiffs' lack of concurrency expertise and limited professional role disqualified them from reviewing TCM's concurrency decisions.  In Defendants' Ninth Circuit brief, they argued:

> TCM, the experts in concurrency analysis, determines whether concurrency certificates should be issued, using the Concurrency model to assess whether the road system can accommodate proposed future development.  Review of concurrency applications requires detailed assessments of existing and "committed" roadway, and existing and "pipeline" land use development in order to predict future levels of congestion on roadways within King County.
>
> Plaintiffs concede that, unlike the traffic modelers in the TCM group, they are <u>not</u> experts in concurrency analysis.  Nevertheless, this case involves Plaintiffs telling TCM how to do their job.

(Dkt. No. 195-2 at 83 (internal citations omitted).)

ORDER - 6

In short, the evidence in the record gives no clear indication whether Plaintiffs' job duties included reviewing TCM's concurrency decisions. However, even if such responsibility was part of Plaintiffs' official duties, the speech at issue is protected because, as discussed below, the primary purpose of that speech was to communicate alleged governmental misconduct to County authorities outside the Department of Transportation.

III. External Reports of Alleged Misconduct in the Department

Regardless of whether Plaintiffs were required to review TCM's concurrency decisions, the external reports of alleged misconduct submitted to the County Ombudsman, Executive, Prosecutor, and Council could not have been made pursuant to Plaintiffs' official employment duties. The Ninth Circuit recently held that a prison guard's reports of hostile inmate conduct communicated to a Senator and the Office of Inspector General were protected speech because the "right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee." Freitag v. Ayers, 468 F.3d 528, 545 (9th Cir. 2006). Critically, the Ninth Circuit held that a public employee "does not lose her right to speak as a citizen simply because she initiated the communications while at work or because they concerned the subject matter of her employment." Id. Instead, the court determined that "[i]t was certainly not part of [the plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly[.] ... Rather, it was [her] responsibility as a citizen to expose such official malfeasance to broader scrutiny." Id.

The Frietag court also found that internal disciplinary reports and complaints to the prison warden were not constitutionally protected because they were submitted pursuant to official correctional officer duties. Frietag, 468 F.3d at 546. But that decision "was not reached merely because these forms were internal." Marable v. Nitchman, 511 F.3d 924, 931, 932 (9th Cir. 2007). Instead, the Court must evaluate whether speech – be it internal or external to a government employee's department – was part of the work that the employee "was paid to perform." Freitag, 468

ORDER - 7

F.3d at 544 (quoting Garcetti, 547 U.S. at 422). This determination requires a "practical inquiry." Marable, 511 F.3d at 932.

Careful review of the communications at issue reveals that they were not part of the duties that Plaintiffs were paid to perform. Plaintiffs' email to the King County Prosecuting Attorney expressed TFDM's belief that its department "may have deliberately provided false information to the King County Council." (Dkt. No. 195-2 at 74.) Plaintiffs' emails to the County Executive and County Council informed those authorities of TFDM's opinion that the concurrency program "is incorrect and would be vulnerable in a court of law." (Dkt. No. 195-2 at 72, 76.) The purpose of the whistleblower complaint that Plaintiffs submitted to the County Ombudsman is described as follows:

> to present information that has led us to conclude that individual managers and/or employees within the King County Department of Transportation, Road Services Division have committed improper actions which constitute an abuse of authority, have potentially resulted in a gross waste of public funds, and have possibly violated County, State or Federal law.

(Dkt. No. 194-2 at 19.) While each of these communications includes Plaintiffs' opinions about traffic forecasting decisions, the primary purpose of the speech was to report alleged misconduct within the Department of Transportation and to request that the recipients initiate an outside investigation. These communications are analogous to the Frietag complaints directing reports of alleged governmental misconduct to officials outside the employee's department and would fall outside Plaintiffs' official duties even if those duties included reviewing concurrency determinations by TCM.

While government employees are commonly required to report misconduct to their supervisors, reports of misconduct to authorities outside the department are not often considered work duties that the employee is "paid to perform." See Eberz v. Oregon Dept. of State Police, No. CV-06-641-TC, 2008 WL 697419, at *12 (D.Or. March 14, 2008) (finding that a police officer's duties required him to report misconduct to his supervisor, but a report of the alleged misconduct to the Attorney General was protected speech). Plaintiffs first voiced their opinions about TCM's

ORDER - 8

concurrency decision internally, to their supervisor Jennifer Lindwall and to TCM, and do not allege that those communications are protected speech. However, on the belief that their internal complaints were improperly ignored, Plaintiffs then communicated their concerns outside the department to County officials in an effort to attract public attention to the alleged misconduct. See id. (stating that the plaintiff's letter to the Attorney General was an effort "to attract[] public attention as a citizen"). Plaintiffs were not performing work responsibilities when they complained to County authorities about the Department's "failure to perform its duties properly" but were exercising their right as citizens to expose the alleged misconduct to "broader scrutiny." Freitag, 468 F.3d at 545.

In the face of established law, Defendants attempt to identify King County Executive Ron Sims as Plaintiffs' "ultimate supervisor" and contend that, if Plaintiffs were responsible for reviewing TCM's decisions, they must also have been responsible for reporting any perceived problems with those decisions "up the chain of command." (Dkt. No. 226 at 4, 8; Dkt. No. 196 at 19.) Defendants further argue that the County Ombudsman, Executive, Prosecutor and Council are the "people to whom a government employee would be expected to complain." (Dkt. No. 196 at 20.) Specifically, Defendants assert that the King County Council "was the governmental body ultimately responsible for deciding whether to uphold the concurrency certificate determination" and therefore was an appropriate recipient of Plaintiffs' work-related complaint. (Dkt. No. 196 at 24.) Yet, Defendants point to no evidence in the record suggesting that Plaintiffs' job duties required them to report concerns directly to these authorities in addition to offering their opinions to their supervisors and colleagues within the Department of Transportation.

Defendants correctly assert that Mr. Chen's official duties required him to "[s]erve as a technical expert to agency or to external decision makers such as the Metropolitan King County Council" and "[p]rovide technical advice to elected officials." (Dkt. No. 153-6 at 4-5.) But Plaintiffs' complaints to County authorities went beyond mere technical advice – they reported alleged misconduct within the Department of Transportation. Just as in Freitag, Plaintiffs' external

ORDER - 9

communications contained a summary of the complaints they had voiced internally, but are protected speech because they primarily communicate Plaintiffs' belief that the department was engaged in wrongdoing. Further, Plaintiffs believed that these County officials had some power to investigate and halt the alleged misconduct.

Finally, this Court is not convinced by Defendants' argument that Plaintiffs' external complaints are unprotected because they were each addressed to officials identified in the County's "Whistleblower Protection" policy as proper recipients of reports of governmental misconduct. (Dkt. No. 153-7 at 46; King County Code § 3.42.020.) That policy aims to encourage employees "to report on improper governmental action to the appropriate county or other government official" and protects those employees from any resulting retaliatory action. (Dkt. No. 153-7 at 46.) The policy does not make reporting governmental misconduct an official job duty of every government employee.

IV. The Union Grievance is Protected Speech

Plaintiffs' union grievance dated February 6, 2003, alleges that TFDM's supervisors had improperly contracted out work that should have been performed in-house by TFDM. (Dkt. No. 195-2 at 78.) The substance of this grievance, proper assignment of traffic-forecasting work, does not fall within Plaintiffs' work duties as the employees who perform that work. In response to the grievance, a Department supervisor, Linda Dougherty, stated clearly that TFDM has no authority over how work assignments are made. (Dkt. No. 153-4 at 29.)

Defendants' arguments that the grievance is not protected speech because it was "internal" and was brought pursuant to the grievance procedure in Plaintiffs' union contract are unavailing. (Dkt. No. 196 at 20.) Because nothing in the record suggests that filing grievances was an official duty that Plaintiffs' were "paid to perform," the speech is constitutionally protected.

**Conclusion**

Because Plaintiffs' union grievance and communications to the County Ombudsman, Executive, Prosecutor, and Council were not made pursuant to Plaintiffs' official job duties, the speech is constitutionally protected and may form the basis for a first amendment retaliation claim.

The Clerk is directed to send copies of this order to all counsel of record.

Dated: December 17, 2008.

*[signature]*

Marsha J. Pechman

U.S. District Judge

ORDER - 11